At a Court of Oyer and Terminer held at this term, Joseph H. Taylor was indicted and tried before Wootten, Houston and Wales, Judges, for the murder of Robert A. Mackey in the first degree, in St. Georges' hundred on the 28th day of July preceding. The evidence on which the prosecution relied for a conviction was wholly circumstantial, and consisted of the following testimony in substance: John E. Lewis, keeper of the Deer Park hotel at Newark, testified that he was but slightly acquainted *Page 437 
with Robert H. Mackey, the deceased, but he was a guest at his home and took his breakfast there the morning of that day about 7 o'clock and settled his bill for himself, and horse, and left a little after 9 o'clock. Joseph H. Taylor, the prisoner, was then there, and took him out one side and told him he was in the lightning-rod business. While Mackey had his horse and carriage standing before the door of his hotel the first he saw of Taylor that morning, he and Mackey were coming round the corner of the hotel, and there met, and spoke to each as acquaintances, and walked into the bar-room and took a drink together. Soon afterwards he saw them standing before the door by the side of the horse and carriage talking together, and heard Taylor tell him that he was going down to Mrs. Sears' to see about putting up a lightning rod, but before that he had told him that he was going home. Mackey drove a brown mare to a falling top wagon for two persons.
Samuel L. Garrett testified that he lived in Newark at that time and was acquainted with both the prisoner and the deceased, and that the weight of the latter he should suppose was a hundred and thirty or a hundred and forty pounds, and that he was lame in his right leg, and that he saw them there that morning at the Deer Park hotel between 8 and 9 o'clock, and saw them afterwards at the Washington House, about three hundred yards from it. Mackey was sitting on the porch with his horse and buggy standing in front of it on the street, and in passing he stopped to speak with him, and he invited him into the bar for the purpose, and they stepped in and took a drink together; just as they had finished Taylor was seen to be in the room, and Mackey invited him to take a drink also, which he did, and Mackey paid seven cents for it which seemed to be all the change he had. And Mackey and Taylor afterwards came out of the barroom and got into the buggy and drove off together down the main street of the town in an eastern direction *Page 438 
towards Ogletown and Christeen. After they had all three taken a drink as before stated, he and Mackey went out on the porch and took seats, and after awhile Mackey and Taylor went into the bar-room again and staid about five minutes before they came out again and got in the buggy and drove off, as he had already stated.
John Strickline, bar-keeper at the Washington House, confirmed the statement of the preceding witness as to the three drinks taken by him and Mackey and Taylor at the bar there that morning, and further testified that when the latter were about to drive off together they came into the bar-room again together and Taylor enquired of him what time dinner would be ready at the hotel, and when he told him at half-past 12 o'clock, said to him they would be back in time for it, and told him to take care of his valise, which he did, but he never came back for it afterwards. Taylor was dressed in light and Mackey in dark colored clothes, and Taylor was a taller and larger man than Mackey. He has been acquainted with both of them for several years, but had never seen them together before that time he believed; they had been acquainted with each other however, prior to that time. Taylor and Mackey took another drink together at the bar just before they left, and Taylor told him that he would pay for it when he came back for his valise.
Georgianna Bullin, keeper of a public house in Christeen, testified that Taylor and Mackey drove up to her house there about 11 o'clock that morning. Taylor was driving and got out of the carriage first, and Mackey afterwards. Taylor told her he was going to St. George's. She thought Taylor was sober, but Mackey was under the influence of liquor. Taylor told her if Mackey asked for beer not to let him have any; for he had been drinking, and he did not want him to have any more. She told Taylor she did not keep or sell any liquor but beer. They *Page 439 
did not stop long at her house, and Taylor was driving when they started off.
Abel Riggs testified that he kept bar at that time for Ivan D. Wallace at St. George's, and that Mackey and Taylor came there that day between two and three o'clock in the afternoon in a york wagon drawn by a dark bay horse, with the top down, and remained there about an hour. They took a drink together at the bar soon after they came in, and Mackey then took a seat in the barroom and soon fell asleep in it. Their horse was turned out and fed. Taylor spoke about his being in the lightning rod business, and engaged board there for three men and three horses. Taylor and Mr. Wallace went out of the hotel together, and when they came back again into the bar room Taylor wanted to sell the horse they had driven there to Mr. Wallace; and when they left there in the carriage between four and five o'clock in the afternoon Taylor was on the right side of it and Mackey on the left, and Taylor was driving. Mackey was dressed in dark and Taylor in light colored clothes and they both had their coats on. The carriage top was down, and it was a clear day and a little warm. They drove from the hotel down towards the canal bridge and Odessa. Mackey took but one drink there, but Taylor took more, and bought a pint of whiskey of him which he took away in a bottle with him, and which he promised to pay for the next Friday, but neither that or the feed of the horse had been paid for yet. Taylor directed both to be charged to him. Odessa is seven miles from St. Georges's. He had seen Mackey once, but Taylor never before that day, and he first heard of the death of Mackey in the evening of the next Friday.
Philip Reading, negro, the hostler at the same hotel, testified that Mr. Mackey and another man he then did not know, but learnt while he was there that his name was Taylor, and who was the same person as the prisoner *Page 440 
then in the box, came there that day to Mr. Wallace's hotel in a York wagon, with a dark bay mare from the direction of Delaware City, and he heard the man named Taylor while there bragging on her great speed as a trotter. When they were about to start away Taylor picked Mackey up and put him in the carriage which made him so angry that he got out of it, and said to him that he would let him know that that horse and carriage belonged to him. But Taylor after a while succeeded in coaxing him to get in it again, which he helped him to do, and then got in himself on the right side and took the reins, and drew the mare whose head was towards Kirkwood, short around towards Odessa in the opposite direction, and drove off. It was then about 4 o'clock in the afternoon, and they had been there about an hour. The carriage top was half down when they came and when they left. The mare was very much jaded, and did not mind the whip when he cut her hard with it at starting from there. He afterwards recognized her when she was brought back to Mr. Wallace's hotel there, and then found that she had a good many severe marks of the whip on her right side. They both had their coats on when they left there.
William Fleming testified that he lived on the 28th day of July last near McDonough between St. George's and Delaware City, and was driving a team on the road pretty late in the afternoon of that day when he met a horse and wagon coming pretty fast, with what he supposed at first, while it was yet some distance from him, but one man in it, but as it came nearer to him he saw there was one sitting up on the right side of it driving, and another man on the left side of the seat of it, but lying sideways with his head across the lap of the other, who had his left arm and hand around and over his head and face and holding the reins in that band, while with the whip in his right hand he was whipping the horse at almost every step, and in that way they met and passed him. It was a dark bay animal which he noticed more than he did *Page 441 
either of the men in the carriage, as it was moving quite fast. He remembered that the man sitting up and driving on the right side of the carriage was dressed in light colored clothes, but he could not say how the one lying with his head and face across his lap was dressed. His face was so much hid by the left arm and hand of the other and the way the reins were held over it, that he could see but little of them, as they approached or passed him. He had never seen either of the men before to the best of his knowledge, but he recognized the animal as soon as he saw her in a short time afterwards.
Rebecca Farrell, negro, testified that she then lived at Drawyer's Bridge, and about 5 o'clock in the afternoon of the 28th day of July last she was in her garden between her house and the bridge, and heard a carriage coming before she saw it, and looked up and saw a horse and carriage coming on the road towards Odessa. In it were two men, one of them was driving and the other was lying down across his lap. The one that was driving was sitting on the right side of the carriage. He had on a dark coat, and the one that was lying down was in his shirt sleeves, and seemed to be a shorter man than the other. The one that was driving seemed to be a nice looking gentleman. The horse was in a slow walk when they passed by where she was, and after it had passed he looked back towards her until the carriage was twenty or twenty-five yards down the road from her. The horse was what she would call a bay horse. The top of the carriage was up, but both the back and the side curtains were off or were rolled up.
Nathan Farrell, negro, the husband of the preceding witness, testified that he lived at the same place, and the same afternoon while he was hoeing corn in his lot he saw a horse and buggy pass on the road and drive up to and on the bridge, and saw them stop and a tall man in light colored clothes get out of the carriage and walk round *Page 442 
the horse on the bridge, and soon heard a splash, and looked again and saw a tall gentleman-looking man dressed in light clothes standing on the wing wall of the bridge looking down in the water; the horse and carriage were then standing on the bridge close up to the east side of it. He had a full view of the man standing on the stone wall and wing of it, but not so good a view of the horse and carriage. He kept on at his work, and soon afterwards when he looked up again the man and the horse and carriage were gone. It was then about 5 o'clock in the afternoon. It had rained the night before and softened the ground, and when he walked down to the bridge about sun-down that afternoon, he noticed the track of a carriage that had been driven up on the bridge nearer the cast side of it than he had ever seen before. It was as close to the wall of the bridge as the carriage could get. The top of the carriage was up.
Joseph Roberts, a surveyor, testified that at the instance of the Attorney General he had made the necessary survey and measurement and prepared a plot of Drawyer's Bridge over Drawyer's Creek in St. Georges' hundred, and the road and locality referred to by the two preceding witnesses, and marked the measurement upon the plot or diagram produced and submitted to the Court and jury by the Attorney General. He then proceeded and stated that as appeared by it, the bridge was twenty-four feet long, and fourteen feet two inches wide, the wing walls at each end of it nineteen feet long, the railing on the side of it was three feet five inches high, the mean rise and fall of the tide in the creek there was three feet, the floor of the bridge was four feet two inches above the water when he measured it, and the channel of the creek beneath the middle of the bridge was ten feet six inches deep, and at the southern end of the bridge the creek was eight feet four inches deep; and that end of it is ninety-four yards from the house of Nathan Farrell, the witness who had just testified in the case, and is one *Page 443 
hundred and forty-four yards from the place where he was at work in his lot at the time he has spoken of, and eighty-six yards from the place in their garden where his wife, Rebecca Farrell, was at the time she has spoken of, and it was fifty feet from that point to the horse and carriage when she first saw it on the road. The average height of the wing walls at the southern end of the bridge is eighteen inches, and of those at the northern end thirty-two inches. When he made these measurements the stage of the tide at the bridge was eighteen inches below full flood tide or high water.
Asbury Pennington testified that he saw Taylor, the prisoner, at the Head of Sassafras between half-past 5 and half-past 6 o'clock in the afternoon of the 28th of July last, with a bay mare and a York wagon which he said he wanted to sell, and that she could carry two men in a carriage a mile in three minutes and twenty seconds. He said he was going to Massey's Cross Roads. He was then dressed in a dark blue coat and light colored pantaloons.
Joseph L. Parsons testified that he saw the prisoner at his hotel in Middletown on Tuesday evening the 28th of July last, with a buggy and a dark bay or brown mare, and that he wanted a drink, but he told him he thought he had had enough, and did not let him have it. He had on a dark blue coat and light colored pants and he also had another coat of light colored check with him. He came back early the next morning and stayed at Middletown till near night, and he first traded the bay mare off that day with Mr. Stomboy for a mouse-colored horse and twenty-five dollars to boot, and also the wagon the same day with Mr. John D. Roberts for a buggy without a top and twenty dollars. He then traded the horse he got from Mr. Stomboy for another with another person, and got fifteen dollars to boot in that trade He took a good many drinks of whiskey that day. He took the light colored coat away with him. *Page 444 
James E. Townsend testified that the prisoner came to his hotel at Townsend the 29th of July last, with a Jagger wagon and an old brown horse and left the next morning with them going in a northward direction towards Odessa or Smyrna. He would have taken him to be a sober man when he came, but after he had taken several drinks he seemed to become nervous and uneasy. About 11 o'clock he told him it was bed time, but he did not seem inclined to go, and he then wanted him to buy his horse and wagon. He had seen him very early that morning at Middletown, before he came from there to Townsend, and at Middletown he called himself "Tom Collins."
James L. Currey testified that he saw the prisoner at the hotel in Odessa on the 30th day of July last; he had a horse and buggy, and as soon as he came in he wanted to knew if any body there had a horse and buggy he wanted to trade. He had on a dark blue coat and had another with him of a light plaid color like the one he had on in the prisoner's dock; and he took several drinks while he was there. And George Gilch testified that he saw the prisoner in Odessa on the 30th of July last, and traded horses with him and got a black horse from him for a bay one, and paid him five dollars to boot about 2 o'clock in the afternoon of that day.
Caleb Miller testified that the prisoner left a horse and carriage and harness at the White Horse Hotel in the City of Wilmington kept by him, towards the close of the day on the 30th of July last, and had disappeared from there without ever having called for them.
On the 31st day of July last the body of an unknown dead man was found on the surface of Drawyer's Creek above and near the bridge before described dressed in dark pantaloons and vest, but without any coat on, which was afterwards fully and satisfactorily identified by a brother and a brother-in-law of the deceased and by Doct. Peter V. *Page 445 
Stroud, all from Parkesburgh, Chester County, Pennsylvania, where both the prisoner and the deceased had also resided up to the time of his death, as the body of Robert A. Mackey, and by whom it was proved that he had left that place on the 27th day of July last and driven to Newark alone in the horse and wagon which he had there, and which he had borrowed for the occasion of his brother-in-law, and where he met on the following day with the prisoner at the bar, whom he had previously long known in Chester County in that State. There had been two inquests held on the body by the coroner of New Castle County, the first on the day of the discovery of it, and the second a week later, it having in the mean time been interred and then disinterred at the instance of the friends before referred to, for that purpose and for their identification, who had not been apprised of the finding of it, until after the first inquest. The physician present at both inquests and who examined the body on both occasions testified that he found no wounds whatever upon it, but he did not examine the lungs or the stomach, although at the second inquest he removed the scalp. One of his wrists had been somewhat injured and he found that one of his knee joints was stiff.
Soon after the prisoner returned to Chester County, Pennsylvania, and before these proceedings had been concluded, he had gone to the State of Ohio, and the friends of the deceased in the former State learning that he was at the town of Bucyrus, in Crawford County, in the latter State, addressed a letter to Henry I. Row, the sheriff of that county, who was present as a witness in Court and testified that upon the receipt of the letter he arrested the prisoner on the 17th day of August last in the town of Bucyrus, the county seat of Crawford County in the State of Ohio, and took him to jail there, on the charge of having just murdered a man who lived in Chester County, Pennsylvania. He had on at the time light colored pants and a dark blue coat of a somewhat peculiar color, described in the letter, and which also contained a *Page 446 
small fragment of the material of which it was made, in consequence of which he at once took the coat from him, and had it then here with him ready to be produced in Court. Robert A. Mackey was the name of the man stated to have been murdered by him. He informed him of the charge when he arrested him, and he took no exception to his authority to do it, but went with him without any difficulty to prison. Two days afterwards in a conversation with him in the jail, he told him that he and Mackey had been riding together and on a big drunk, and that coming to a bridge across a creek, Mackey driving and licking the horse, he ran the wagon against one side of the bridge which frightened the horse and made it run, and when it got off the bridge, and he, the prisoner, had got it stopped, he jumped out and seized it by the head, and told Mackey to get out and turn the carriage-body so as to unlock the wheels which had occurred in taking up the horse, and that soon after Mackey got out and went round behind the carriage he heard a splash in the water, and went back there himself as soon as he could get the horse out of the fix, and looked about for him but could not find him, and had not seen him since, and he then got in the carriage and drove off.
A requisition was afterward issued by the Governor of this State to the Sheriff of this county on the Governor of Ohio for the surrender of the prisoner, and upon which he was duly surrendered and brought back here for indictment and trial. In the execution of this mission the Sheriff was accompanied and assisted by James Hanmell, of Chester County. Pennsylvania, who was well acquainted with both the prisoner and the deceased, and who was also present and examined as a witness in the case, and who stated that while he was in Bucyrus he talked with the prisoner in the jail there about the death of Robert J. Mackey and he asked him where he and Mackey at that time had been, and he said he got in with him at Newark and they drove down to Christeen and St. Georges' and until they got to the place where he lost him. He *Page 447 
then asked him how he came to lose him, and he said that in coining to a bridge over a creek, they ran the carriage against a tree which threw them out of it, that he went around behind the carriage to lift it around, after which he led the horse and carriage across the bridge to the other side of the creek, took a drink out of his bottle and then went back to look for Mackey, but could not see him anywhere, and he thought he must have fallen in the creek and sank out of sight before he got back, and he then drove from there to the Head of Sassafras.
The coat which the prisoner had on when he was arrested in Bucyrus was then produced and exhibited in evidence, and was proved and identified as the coat of the deceased by several witnesses, and among them, by the tailor who had made it for him about the middle of July the year before.
I think I may be permitted to congratulate you, my brothers on the bench and myself on the approach of this protracted case to its final termination. When I speak of it however as a protracted case, I do not mean to say it has been very unnecessarily so. Its magnitude requires time and careful investigation.
Joseph H. Taylor the prisoner at the bar stands indicted for the murder of Robert A. Mackey, and of murder of the first degree, alleged to have been committed on the 23th of July last at Drawyer's bridge and creek in this county. It is charged in the indictment that the prisoner at the bar then and there with malice aforethought cast, threw and pushed Robert A. Mackey into that creek in which there was a great quantity of water, and that by and with the water the said Robert A. Mackey was choked, suffocated and drowned. To this indictment the prisoner at the bar pleaded that he is not guilty, and put himself upon God and his country, of which country you are, and the issue which you are sworn to try is, whether he is, or is not guilty in the manner and form as he stands indicted. It is proper for me to say, that under this indictment he may be convicted of murder of the first degree, or he may be acquitted as he stands indicted and convicted of murder of the second degree, or he may not be convicted of murder of either degree, but of manslaughter; but if you should be satisfied after a careful and full consideration of all the evidence and applying it to the law as I shall give, it to you, that it is not proved sufficiently and beyond a reasonable doubt that he is guilty of murder of either degree, or of manslaughter, your verdict should be one of acquittal, this being the only offense of which he can be convicted under this indictment.
The case, gentlemen, is of great importance, as well to the community, as to the prisoner at the bar. The object *Page 451 
of the criminal law is not merely to punish those who violate it, but for the protection of society, and its pains and penalties are therefore held out to others as beacons of warning to deter them from the commission of like offenses. It is of course important to the prisoner at the bar, because his life is involved in, and hangs upon its issue. You have the evidence as given to you by the witnesses, and I shall endeavor to give you the law applicable to the case, as clearly and as briefly as I am able, and it will then be your duty to apply it to the evidence and upon the law as you will have it from the Court and the evidence as given to you by the witnesses and otherwise, and thus determine the guilt or innocence of the prisoner at the bar, without considering what may be the consequences to him, your duty being simply to find the fact of guilt or innocence.
The Judge then reviewed the evidence and added, I have not repeated all of it, and if I have not correctly stated such portions as I have referred to, you will correct me; my object in referring to it at all is merely to direct your attention to the proper line of your investigation, and have therefore only glanced over the outlines, leaving it entirely for you to judge of the evidence, and not only as to what has been proved, but of the weight and credit which you will give to it, which is your exclusive province, and I have no disposition to invade it. In considering the evidence, if it is conflicting you should reconcile all its conflicting elements, if you can, so as to harmonize it all, but if it should be so conflicting as to be irreconcilable, you must give credit to that portion, which you may believe to be most entitled to it, and reject such as you may think the least worthy of, credit.
We come now to notice more particularly, the crime with which the prisoner at the bar is charged by the indictment, and the law applicable to it. The indictment charges that the prisoner at the bar on the 28th day of July last with express malice aforethought, cast, threw and pushed Robert A. Mackey into Drawyer's *Page 452 
creek at St. Georges' Hundred, in which creek there was a great quantity of water, and that by reason of such casting, throwing and pushing of the said Robert A. Mackey into the creek aforesaid, he was then and there choked, suffocated, and drowned, of which said choking, suffocating and drowning, he, the said Robert A, Mackey, instantly died. This the indictment alleges to be murder of the first degree.
The prisoner at the bar, through his counsel denies these allegations and insists that there is no proof of the corpus delicti, that there is no evidence that Mackey was cast, thrown and pushed into the creek by the prisoner at the bar, and they further insist that there is no evidence whatever that Mackey came to his death by choking, suffocating and drowning. These facts must be established by the evidence to the satisfaction of the jury beyond a reasonable doubt, which may be direct or circumstantial or presumptive. This case rests entirely on circumstantial or presumptive evidence, and you must draw your conclusions from all the facts and circumstances which are in evidence before you.
I will now, gentlemen, give you the law applicable to this case as clearly and as briefly as f am able. The prisoner at the bar stands indicted for murder of the first degree, and to determine the issue it is necessary that you should understand the nature and character of the crime, and what constitutes it. Murder of the first degree under our statute, is the killing a human being with what the law terms express malice aforethought, which is where one person kills another willfully and deliberately and with a formed design; such formed design being evidenced by some external circumstances indicating the concealed purposes of the heart, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party slain some bodily harm.
Every felonious murder is presumed by law to be malicious, and therefore murder, until the contrary appears from some circumstances of alleviation, excuse, or justification *Page 453 
which must be shown by the prisoner by way of defense, or disclosed by the evidence on the part of the State. So that when the State has established the fact of killing, it devolves upon the prisoner to show that the circumstances under which the act was committed, are such as to render the crime below that of murder, unless the evidence on the part of the State discloses such facts and circumstances as will so reduce the crime. The Attorney General takes the ground, that the prisoner at the bar is guilty of murder of the first degree, or nothing. It so strikes us, but we do not wish to express any opinion in reference to his guilt or innocence. If your investigation should be confined to that issue, it would be unnecessary to explain to you, murder of the second degree, or manslaughter. I will however say, that murder of the second degree is when one person kills another without express malice aforethought, but with what the law terms implied malice, and which malice is implied by law from any deliberate, cruel act committed by one person against another however sudden, as when one person suddenly kills another, without any, or without a considerable provocation, not amounting however to such palliation, excuse or justification as would reduce the offense below the crime of murder of either degree, or excuse or justify the act of killing entirely. Homicide committed without malice either express or implied by law, does not amount to murder of either degree, because of the absence of malice, which is the essential element of murder. It is the distinguishing feature between murder and manslaughter.
I have said, and it is conceded, that this case rests entirely upon circumstantial evidence, and upon that it must stand or fall. Much has been written on this subject, and much said in this case. The rule however may be stated in few words and, perhaps, more satisfactory to the minds of the jury, than by more extended remarks. The rule is that circumstantial evidence must be of such a character as to exclude any other hypothesis, but that of the guilt *Page 454 
of the party. In such cases a verdict may well be founded on circumstances alone; and these often lead to a conclusion far more satisfactory than direct evidence can produce. The onus of proof is on the State, to establish the corpus delicti, either by direct proof, or by circumstantial or presumptive evidence, and all the material allegations in the indictment must be so established to the satisfaction of the jury beyond a reasonable doubt. It must be proved first that the party alleged to have been murdered, is dead; secondly, that he came to his death as charged in the indictment, in this case, by choking, suffocation and drowning, for if it should appear that he came to his death in any other manner, the prisoner cannot be convicted under this indictment; and then it must be proved that the prisoner at the bar committed the act which resulted in his death. In this case there is no controversy about the death of Mackey, but it is denied that Taylor, cast, threw, and pushed him into Drawyer's creek, and that he came to his death by choking, suffocation and drowning. These facts we say to you must be proved beyond a reasonable doubt, and the evidence offered by the State being entirely circumstantial, they must be proved to the exclusion of every other reasonable hypothesis except that of the guilt of the prisoner. If they are not so proved the prisoner will be entitled to your verdict. Bat if the circumstances attending the case as proved before you, are such as to lead your minds to the conclusion of the guilt of the prisoner to the exclusion of every other reasonable hypothesis, it will be your duty to convict him.
If upon a full and careful consideration of all the facts and circumstances surrounding the case, you should entertain a reasonable doubt, growing out of the evidence, such a doubt as reasonable men would be constrained to entertain, the prisoner will be entitled to the benefit of that doubt.
 Verdict — "Not Guilty." *Page 455